C.J., Appellant,

v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Appellee.**

No. S–9518.

Supreme Court of Alaska.

March 16, 2001.

---

**14.** See Lumbermens Mut. Cas. Co. v. Continental Cas. Co., 387 P.2d 104, 109 (Alaska 1963).

**15.** AS 25.20.110(c).

Thom F. Janidlo, Anchorage, for Appellant.

Vennie E. Nemecek, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, and Robert R. Polley, Assistant Public Advocate, Anchor-

age, and Brant McGee, Public Advocate, Anchorage, for Appellee.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

OPINION

CARPENETI, Justice.

## I. INTRODUCTION

C.J. appeals the decision of the superior court to terminate his parental rights. The superior court found that C.J.'s children were in need of aid, that the state had made active efforts to reunify C.J. with his children, and that placement with C.J. was likely to result in serious physical or emotional damage to the children. Because the state did not produce evidence beyond a reasonable doubt that placement of the children with C.J. is likely to result in serious emotional or physical damage to the children, and because the state did not make active efforts to reunify C.J. with his children, we reverse the termination of C.J.'s parental rights.

## II. FACTS AND PROCEEDINGS

J.J. (mother) and C.J. (father) are the biological parents of T.J. and K.J. Until February 1998 the children lived with their mother in Anchorage, while C.J. resided in Florida with another of his children, R.J., who is not involved in this case. T.J. and K.J. are Indian children as defined by the Indian Child Welfare Act (ICWA),[1] based on the tribal affiliation of their mother.

On February 22, 1998, Anchorage police took T.J. and K.J., then four and two years of age, into protective custody after strangers found them wandering unsupervised in the street, dressed only in underclothes in thirty-two degree weather. Their mother had left the children alone between 8:30 and 9:00 p.m., and did not return home until after 10:00 p.m., at which time she was extremely intoxicated. She was arrested and charged with child abuse or neglect.

The Department of Health and Social Services, Division of Family and Youth Services (DFYS) assumed custody of the children and subsequently filed a Petition for Adjudication of Children in Need of Aid. After a probable cause finding was made in March, the children were placed into foster care. At a full adjudication in August, the court found that the children were in need of aid.

At the request of the parties and pursuant to the Interstate Compact on the Placement of Children (ICPC),[2] the superior court ordered "the Compact Administrator for the State of Florida" on three different occasions to conduct an expedited home study of C.J.'s living situation. DFYS social worker Larry Overholser testified that he received two letters from the assigned coordinator in Florida in response to these requests. The first letter, dated April 15, allegedly indicated that C.J. claimed to be unable to care for the children at that time. No further explanation was provided by Mr. Overholser. For his part, C.J. testified that when he was first contacted about taking his children, he was unable to do so because of travel required by his work. The second letter, dated October 12, stated that C.J. had failed to respond to requests for basic personal and employment information and had not been able to establish a stable home after several months, but also stated that he wished to take his children. C.J. testified that he had quit his job in order to be able to take his children, and that a home study of his house by the Florida social worker was favorable: "She said that she thought it would be fine, and a good place for the kids." Nonetheless, placement of the children with C.J. was denied by Florida authorities.

C.J. maintained telephone contact with the children at the foster home approximately once or twice a month during 1998. However, his phone calls ceased after Christmas of 1998. Attempts by the foster parent to contact C.J. a few months later failed. C.J. testified that "there is no excuse for me not contacting them for that period of time," but he also said that he "really fell apart after I was told I'm—I wasn't going to get them, period." In April 1999 the court ruled that DFYS need not take further steps to return the children to the home. The social worker was able to contact C.J. in October of 1999,

1. 25 U.S.C. §§ 1901–23 (2000).

2. AS 47.70.010.

at which time C.J. expressed an interest in taking custody of the children.

A trial to terminate parental rights was held on November 8, 1999. J.J. appeared in person, and C.J. participated telephonically. After hearing the evidence, the superior court terminated the parental rights of both parents. With respect to C.J., the court found: (1) C.J. had abandoned his children as defined by statute, (2) C.J.'s conduct caused the children to be children in need of aid, which would continue unless parental rights were terminated, (3) active and reasonable efforts had been made to reunify C.J. and his children, and (4) return of the children to C.J. was likely to cause serious emotional and/or physical damage.

C.J. appeals.

## III. STANDARD OF REVIEW

■ When reviewing issues of termination for a child in need of aid, findings of fact made by the superior court will be upheld unless they are clearly erroneous.[3] Factual findings are clearly erroneous if they leave the reviewing court with a definite and firm conviction that a mistake has been made.[4]

■ Whether the superior court's factual findings comport with the requirements of the child in need of aid statutes or ICWA are questions of law that this court will review de novo.[5]

## IV. DISCUSSION

The decision to terminate parental rights in this case is governed by both state and federal statutes. Alaska standards for terminating parental rights are provided in AS 47.10.088, which requires that the court find (1) by clear and convincing evidence that the child is in need of aid,[6] (2) by clear and convincing evidence that the parent has not remedied the circumstances that put the child in need of aid,[7] and (3) by a preponderance of the evidence that reasonable efforts were made by DFYS to support reunification of the family.[8] In making these findings, the court can also consider any factor that relates to the best interest of the child.[9]

■ In addition to the state requirements, the children in this case fall under the more stringent protections of ICWA.[10] That federal statute requires that any party seeking a termination of parental rights must satisfy the court that active efforts have been made to keep the family together and that those efforts have proved unsuccessful.[11] In addition, the court must find beyond a reasonable doubt,[12] based on evidence that includes testimony of a qualified expert, that placement with the parents is likely to result in serious emotional or physical damage to the children.[13]

The superior court found that all the requirements of both statutes had been satisfied in this case. C.J. argues that the court erred in each of those findings.

A. The State Did Not Present Sufficient Evidence to Support a Finding Beyond a Reasonable Doubt that Placement with C.J. Is Likely to Result in Serious Physical or Emotional Damage to the Children.

C.J. argues that the court erred in finding that serious physical or emotional damage

3. See A.B. v. State, Dep't of Health & Social Servs., 7 P.3d 946, 950 (Alaska 2000); A.A. v. State, Dep't of Family and Youth Servs., 982 P.2d 256, 259 (Alaska 1999).

4. See A.B., 7 P.3d at 950.

5. See id.; A.A., 982 P.2d at 259.

6. See AS 47.10.088(a)(1)(A).

7. See AS 47.10.088(a)(1)(B).

8. See AS 47.10.088(a)(2).

9. See AS 47.10.088(b).

10. ICWA applies even though this case concerns termination of the rights of a non-Indian parent.

See In re Adoption of T.N.F., 781 P.2d 973, 978 (Alaska 1989), cert. denied, Jasso v. Finney, 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 616 (1990).

11. See 25 U.S.C. § 1912(d).

12. ICWA's requirement that this element be established "beyond a reasonable doubt" does not conflict with the findings required under AS 47.10.088, which generally require "clear and convincing evidence," because ICWA and the state statute assess different considerations. See In re J.R.B., 715 P.2d 1170, 1172 (Alaska 1986).

13. See 25 U.S.C. § 1912(f).

was likely to result from placement with him. C.J. claims that evidence that he is capable of being a good father to the children creates a reasonable doubt. The state counters that the testimony of its expert, Dr. Sheila Clarson, provides sufficient support for the court's finding on this point.

Despite the fact that C.J. communicated his renewed interest in being a parent to the children a month before the termination hearing, this last-minute position is weakened by evidence that for several months C.J. did not show an interest in caring for his children. He had been completely out of contact with his children for over ten months prior to the hearing, had not been in contact with his attorney in this matter, had not responded to requests for information from Florida representatives, and had not personally participated in several previous hearings regarding the children. For a substantial period, it can accurately be said that C.J. made no effort to demonstrate his fitness as a parent.

■ However, C.J. does not have the burden to show that he would be a fit parent. Instead, DFYS has the burden to show beyond a reasonable doubt that failure to terminate parental rights is likely to result in serious emotional or physical harm to the children. But the evidence presented by DFYS in this case is insufficient to meet that standard, both in the sense that there is limited evidence against him and substantial evidence in C.J.'s favor.

1. *The testimony of the state's expert was insufficient to meet its burden.*

■ ICWA explicitly requires that evidence establishing that placement with the parent is likely to result in serious physical or emotional harm to the children must "includ[e] testimony of qualified expert witnesses." [14]

The expert presented by DFYS, Dr. Clarson, testified that previous experiences of intermittent contact with their father had been traumatic for the children. In addition, Dr. Clarson expressed concerns that addi-

tional similar experiences in the future could lead to serious physical or emotional harm.

However, the conclusions of Dr. Clarson are considerably weakened by the fact that she received all information about this case from reading the file given to her by DFYS and never met or spoke with either C.J. or the children prior to the hearing. In addition, her conclusions appear to be little more than generalizations about the harms resulting from a parent's absence and provide little discussion of the particular facts of this case. We do not hold that a meeting between the expert and the parties to the termination proceeding is required in every case. But the expert opinion should be based on the particular facts and issues of the case to a greater extent than occurred here, in order to support a finding, beyond a reasonable doubt, that serious physical or emotional harm will result. Moreover, the insufficiency of the expert's testimony becomes even more apparent when the evidence of C.J.'s current living situation is considered in detail.

2. *The state's evidence regarding C.J.'s current living situation was insufficient.*

■ C.J. alleged that his actions and the circumstances which might have led the court to find that the children were in need of aid in 1998 had changed by the time of trial in 1999, and there was no reason to think that his inability or inattention to the task of caring for his children would continue into the future. C.J. argues that the superior court's decision to terminate was improper because he informed the court of his improved work situation and expressed a willingness to take care of the children at the termination hearing. The state responds that C.J. continued to evidence his abandonment of the children by continually failing to participate in the Child in Need of Aid proceedings involving his children.

■ We have said that a decision to terminate parental rights will be reversed "if sufficient evidence does not exist to support the conclusion that the parental conduct which resulted in the determination that the chil-

14. 25 U.S.C. § 1912(f).

dren were in need of aid was likely to continue." [15]

In this case there is unrebutted evidence in the record that C.J. was successfully parenting his older child, as well as evidence that he wished to parent T.J. and K.J. *and had taken steps to put himself in a position to do so.* He testified that, because the state had made it a condition of gaining custody of his children that he quit his job that required travel, he did so and was in the process of relocating. He testified that he obtained steady employment with one company that provided insurance coverage for his children, that he had a good home for the children that the social worker had approved, and that he had been led to believe by the social worker in Florida that he would get custody of the children. While the superior court is not required to credit C.J.'s testimony or weigh it more heavily than contrary testimony, we are struck by the paucity of contrary evidence regarding these points in the record. It consists only of Larry Overholser's testimony as to the conclusory statements of unnamed Florida officials to the effect that C.J. was not approved for placement of the children.

The state relied on the Florida social worker to investigate the appropriateness of C.J.'s living situation for placement of the children. However, the only evidence of this investigation that the state presented at trial was the testimony of DFYS social worker Larry Overholser who reported the content of communications with Florida officials. The state failed to produce any direct evidence from Florida officials or any documents from Florida setting out what Florida officials had done. In addition, according to Overholser's testimony, the denial of placement by Florida officials was based on the bare assertion that C.J. failed to respond to requests for information and a statement from C.J. that he was unable to care for the children at the time that he was first contacted. But as

discussed above, there was substantial and detailed evidence to the contrary in the record. We conclude that the evidence in this case was insufficient to show, beyond a reasonable doubt, that placement of the children with C.J. was likely to result in serious emotional or physical damage to the children. In short, the evidence was insufficient to support termination of C.J.'s parental rights.

B. *The State Did Not Show that It Had Made Active Efforts To Keep the Family Together.*

The paucity of evidence regarding what occurred in Florida is especially troubling in light of ICWA's requirement that the state engage in active efforts to prevent the breakup of the family.[16] Generally, active efforts require that "the state caseworker take[ ] the client through the steps of the plan [for reunification of the family]." [17] The state's efforts to work with C.J. toward reunification in this case are minimal. It appears that the state was satisfied with allowing Florida officials to investigate the case and make reports on their efforts. It is not clear that Florida officials understood that the high standards of ICWA applied to this case or that active efforts were required.

As noted, ICWA requires that a court be able to determine beyond a reasonable doubt that placement of the children with the parent is likely to result in serious damage.[18] The evidence in this case leaves so much uncertainty about C.J.'s present circumstances that such a finding cannot be sustained. And ICWA requires that the state make "active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." [19] Again, there is insufficient evidence here to sustain that finding.

V. *CONCLUSION*

DFYS did not present the superior court sufficient evidence for it to find that the

---

**15.** *In re J.W.,* 921 P.2d 604, 607 (Alaska 1996) (internal quotation marks omitted).

**16.** 25 U.S.C. § 1912(d).

**17.** Craig J. Dorsay, *The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual* 157–58 (1984) (citation omitted), *quoted with approval*

*in A.A.,* 982 P.2d at 261; *see also A.M. v. State,* 945 P.2d 296, 306 (Alaska 1997).

**18.** 25 U.S.C. § 1912(f).

**19.** 25 U.S.C. § 1912(d).

demanding standards of ICWA had been met in this case. We are left with the firm conviction that it was a mistake for the superior court to find, beyond a reasonable doubt, that the children are likely to suffer serious physical or emotional damage if returned to the care of their father. Therefore we RE-VERSE the decision to terminate C.J.'s parental rights.