182 Cal.App.4th 1496 (2010)
In re M.B., a Person Coming Under the Juvenile Court Law.
RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent,
v.
D.B. et al., Defendants and Appellants.
No. E048581.
Court of Appeals of California, Fourth District, Division Two.
March 22, 2010.
*1498 Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant D.B.
Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant C.B.
Pamela J. Walls, County Counsel, and Anna M. Deckert, Deputy County Counsel, for Plaintiff and Respondent.

*1499 OPINION
RAMIREZ, P. J.
D.B., father, and C.B., mother, appeal from a judgment terminating their parental rights to M.B. M.B.'s four older half siblings were previously freed from parental custody and control after D.B. molested his 14-year-old stepdaughter and the parents failed to reunify. Mother was required to keep her children away from D.B., a registered sex offender, but continued her relationship with him, resulting in the birth of M.B. M.B. was made a dependent due to his siblings' neglect and sexual abuse, and services were denied, with the concurrence of the Choctaw Nation of Oklahoma (the Tribe), of which father was an enrolled member.
Subsequently, the court conducted a hearing to select and implement a permanent plan of adoption. (Welf. & Inst. Code,[1] § 366.26.) At the hearing, the juvenile court applied the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.), which requires the expert opinion of an Indian expert that continued custody of the child by the parent or Indian custodian would result in serious emotional or physical damage to the child. Both parents appeal the judgment. Father argues the judgment must be reversed because the Indian expert did not conduct an adequate investigation. Mother joins this challenge. We affirm.

BACKGROUND
Prior to the birth of M.B., mother and father lost custody of four other minors.[2] The three oldest children were made dependents due to mother's neglect, and they were returned to her custody in 2002. The following year, the children were removed again, this time due to allegations that father had molested the oldest stepchild, and mother failed to protect her. In the meantime, mother gave birth to a son who was added to the prior dependency and removed from mother's custody due to risk of harm relating to father's sexual abuse of a sibling and mother's neglect. Parental rights to the older four children were terminated on January 23, 2006.
M.B., the subject of the current dependency proceedings, was born the following year. On July 17, 2007, M.B. (the child) was taken into temporary custody due to risk of sexual abuse based on the sibling's sexual abuse, and because mother maintained a relationship with father, a registered sex *1500 offender. A dependency petition was filed on July 19, 2007, alleging neglect and failure to protect (§ 300, subd. (b)), relating to the risk of molestation arising from mother's cohabitation with father, a registered sex offender, the parents' history of substance abuse, and the parents' failure to reunify with the older children. It was further alleged that the minor's siblings had been abused and neglected, placing him at risk of similar harm. (§ 300, subd. (j).)
The trial court found that ICWA applied at the time of the detention hearing, and made the appropriate findings to justify removal of an Indian child from his parents. The Tribe intervened on August 21, 2007. At the jurisdiction hearing, which was conducted on January 8, 2008,[3] the court struck the neglect and failure to protect allegation (§ 300, subd. (b)), and made a true finding that M.B. was a dependent due to the abuse or neglect of his siblings (§ 300, subd. (j)). The court found that continued custody by his parents was likely to cause M.B., an Indian child, serious physical damage, and that active efforts to prevent removal were unsuccessful. M.B. was removed from his parents' custody and services were denied on the basis of the order terminating parental rights to the child's siblings (§ 361.5, subd. (b)(10)), and father's conviction of a violent felony (§ 361.5, subd. (b)(12)). The Tribe agreed with the recommendation to deny services. The court scheduled a hearing to select and implement a permanent plan of adoption. (§ 366.26.)
The section 366.26 hearing was continued several times to determine placement of M.B., and to allow home evaluations of out-of-state relatives. On May 7, 2008, at a permanent plan review hearing (§ 366.3), the court ordered the Riverside County Department of Public Social Services (DPSS) to look into placement of M.B. in the same adoptive home as his siblings and half sibling. Although DPSS felt M.B. was better off in a placement by himself, on September 16, 2008, the court ordered that M.B. be placed in the siblings' home.
In November 2008, M.B. had adjusted well to the Indian-approved home where his siblings and half sibling lived and the parents continued monthly visits. However, the section 366.26 hearing had to be continued further due to lack of a declaration by an Indian expert. In the meantime, the home study of the prospective adoptive parents that had been completed in March 2007 *1501 relating to the older siblings was amended to include M.B., and the adoption assessment report was prepared. However, by January 2009, the adoptive parents experienced financial and marital problems, and the adoptive father informed DPSS he had second thoughts about adopting. The adoptive mother was still committed to adoption, and DPSS approved her request to adopt M.B. on her own.
On May 14, 2009, the declaration of an Indian expert was filed along with an addendum to the report prepared for the section 366.26 hearing. The declaration set out the Indian expert's qualifications, and explained that the expert had spoken with both the Tribe's social worker and the DPSS social worker, visited the minor, and reviewed the social workers' reports. In the opinion of the Indian expert, continued custody of M.B. by his parents would result in substantial danger to the physical health, safety, protection or physical or emotional well-being of the minor and that active efforts had been made by the social workers to prevent the breakup of the Indian family.
On June 1, 2009, the section 366.26 hearing took place. Initially, all parties stipulated to admission of the reports, including the declaration of the Indian expert. However, after the case was closed to evidence, father argued that the Indian expert's investigation was inadequate, in addition to arguing that adoption would be detrimental due to the existence of a beneficial parent-child relationship. DPSS reopened its case and called the Indian expert as a witness to testify about her specific recommendation that parental rights be terminated. During the parents' cross-examination of the Indian expert, she expanded on the investigation described in her declaration, acknowledging that she normally does not speak to the parents.
At the conclusion of the hearing, the court found beyond a reasonable doubt that M.B. is adoptable; that active efforts had been made to provide remedial services and rehabilitative programs but that such efforts were unsuccessful; that continued custody of the child by the parents was likely to result in serious emotional and physical damage to the child; and that termination of parental rights would not be detrimental to the child. The parents appealed.

DISCUSSION
The parents argue that the judgment terminating parental rights must be reversed because the investigation conducted by the Indian expert was substantively deficient to support the opinion that continued custody of the *1502 child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. In a related argument, the parents argue that the court erred in proceeding to terminate parental rights despite the inadequacy of the Indian expert, and given the court's acknowledgment it did not know what standards applied to expert testimony or investigation.[4]
There was no objection to the admission into evidence of either the Indian expert's declaration or her qualifications to testify as an expert. Although the court stated it did not know the exact specifications that qualify one to be an Indian expert, or if there is a requirement that an Indian expert talk with the parents, it concluded there was some independent investigation. The parents did not object to the court's ruling on the ground it was premature, did not request a continuance, and did not proffer evidence of any specific requirements of an Indian expert, although they had ample time. Thus, we are not concerned with the adequacy of the Indian expert's qualifications or the declaration submitted by the expert in lieu of a report.
Nevertheless, the essence of the parents' arguments is that the judgment terminating parental rights is not supported by sufficient evidence. We disagree.

a. ICWA Does Not Require an Indian Expert to Interview Parents in Every Case.

(1) ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families by establishing minimum federal standards in juvenile dependency cases. (25 U.S.C. §§ 1901, 1902; In re Robert A. (2007) 147 Cal.App.4th 982, 988 [55 Cal.Rptr.3d 74].) Those standards require the juvenile court to make certain findings affecting an Indian child before ordering foster care or terminating parental rights. Before the court can terminate parental rights it must make a finding, "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(f); see also § 366.26, subd. (c)(2)(B)(ii).) This finding is commonly referred to as the ICWA detriment finding. (In re Barbara R. (2006) 137 Cal.App.4th 941, 950 [40 Cal.Rptr.3d 687].)
*1503 (2) The legislative history of ICWA reveals that Congress attributed many unwarranted removals of Indian children to cultural bias on the parts of state courts and social workers making decisions. (Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67593, § D.3, Commentary (Nov. 26, 1979) (Guidelines).) Thus, ICWA and the Guidelines require the use of one or more Indian experts to educate the trial court on the tribal culture and childrearing practices. "Determining the likelihood of future harm frequently involves predicting future behaviorwhich is influenced to a large degree by culture. Specific behavior patterns will often need to be placed in the context of the total culture to determine whether they are likely to cause serious emotional harm." (Guidelines, 44 Fed.Reg. 67584, 67593, § D.4, Commentary.)
ICWA does not require evidence of social and cultural standards of an Indian child's tribe before parental rights are terminated. (In re Brandon T. (2008) 164 Cal.App.4th 1400, 1413 [80 Cal.Rptr.3d 287].) Nor does ICWA require a person who is qualified to testify as an expert on Indian culture to conduct an independent investigation of the causes of the dependency or the recommendations relating to the permanent plan. In this respect, father's assertion that the "whole purpose of [the Indian expert's] independent investigation is to evaluate the case and reach a conclusion that is qualitatively more reliable than the DPSS social worker or the Tribe's social worker" is not covered or included in the Guidelines.[5]
Given the paucity of California decisions governing the standards for Indian expert testimony, father cites several Alaska decisions as support for his assertion that an inadequate expert investigation justifies reversal of an order terminating parental rights. However, those decisions are inapposite. In C.J. v. Department of Health & Social Services (Alaska 2001) 18 P.3d 1214, the Indian expert did not interview either the parent or the child. In that case, the children were removed from the mother in Alaska; the father was a noncustodial, nonoffending parent who lived in Florida. An evaluation of the father's residence under the Interstate Compact for the Placement of Children *1504 (ICPC) initially recommended against placement with the father because his job involved extensive travel. However, the father quit his job in order to take care of his children and a more favorable home study resulted, but Florida rejected the ICPC placement. (18 P.3d at p. 1216.) Parental rights were terminated subsequently on the ground of abandonment, due to the father's lack of communication with the children. (Id. at p. 1217.)
On appeal, the father contended there was insufficient evidence to support the ICWA detriment finding. Although the Alaska Supreme Court acknowledged that the father had failed to maintain contact with his children, he was not required to prove he was a fit parent. (C.J. v. Department of Health & Social Services, supra, 18 P.3d at pp. 1217-1218.) The court went on to note that the social services agency had not met the ICWA detriment standard (18 P.3d at p. 1218), and the Indian expert's opinion, which was based solely on information provided by the social worker, did not establish the standard, either. However, the court did not hold that Indian experts are required to interview the parents. At page 1218, the court stated: "We do not hold that a meeting between the expert and the parties to the termination proceeding is required in every case. But the expert opinion should be based on the particular facts and issues of the case to a greater extent than occurred here, in order to support a finding, beyond a reasonable doubt, that serious physical or emotional harm will result." (Ibid.)
In J.J. v. Alaska (Alaska 2001) 38 P.3d 7, a similar situation was presented involving the same family (the mother's appeal). Parental rights were terminated based on abandonment (due to lack of visits occasioned by the unclear case plan that did not provide for visitation) and that adoption was in the children's best interests. (Id. at p. 8.) The Indian expert did not meet or speak with the mother (J.J.), the children, or the mother's counselors, and the file on which the expert relied was incomplete, omitting much of the mother's rehabilitative efforts. (Id. at p. 10.) The mother abstained from alcohol, submitted to drug testing, completed drug treatment and Alcoholics Anonymous to address substance abuse, and was in a healthy, sober relationship. (Id. at p. 9.)
Nevertheless, the Indian expert concluded that return would be detrimental because remedying the alcohol abuse problem was a separate issue from abandonment, based on the mother's lack of contact with the children, and the expert speculated that the children would suffer additional trauma if the mother regained custody because the "risks" would continue. (J.J. v. Alaska, supra, 38 P.3d at pp. 9-10.) The reversal there was thus grounded on the expert's reliance on outdated information, and the substantial progress made by the mother to meet the requirements of her case plan and establish a safe home for her children (id. at p. 11), circumstances not present here.
*1505 Father acknowledges that a contrary result occurred in the more recent case of J.A. v. Alaska (Alaska 2002) 50 P.3d 395. There, the reviewing court concluded that the experts' failure to meet with the parties was not determinative of the adequacy of their expert opinion to support the termination of parental rights. The court noted that it had previously held in C.J., that such interviews were not required in every case, and observed that both experts were sufficiently apprised of the facts by their review of the social services agency reports and the summaries of the testimony of other witnesses. (J.A., supra, at p. 400.)
A similar result was reached in Marcia V. v. Alaska (Alaska 2009) 201 P.3d 496. In that case, the Alaska court reaffirmed its prior decisions holding that "pretrial interviews by the expert with the parties in a termination case `are not required in every case.' A review of state records and summaries of relevant facts can be enough if they `keep the experts' testimony sufficiently grounded in the facts and issues of the case.'" (Id. at p. 507, fn. omitted.)
(3) We agree with the reasoning of the Alaska courts. The purpose of the Indian expert's testimony is to offer a cultural perspective on a parent's conduct with his or her child to prevent the unwarranted interference with the parent-child relationship due to cultural bias. (Guidelines, 44 Fed.Reg. 67584, 67592-67593, § D.3 & Commentary (Nov. 26, 1979).) The Indian expert's testimony is directed to the question of whether continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child, and not because the family did not conform to a decision maker's stereotype of what a proper family should be. (Guidelines, 44 Fed.Reg. 67584, 67542-67593, D.3.(b) & Commentary.) (4) Father does not point to any cultural evidence that his behavior (including sexual abuse of a stepchild) would be interpreted differently in a cultural context, so knowledge of cultural practices would not be helpful. In other words, unless interviews by the Indian expert with specific parties are relevant to the purpose of the expert's testimonyi.e., whether specific behavior patterns need to be placed in the context of Indian culture to determine whether they are likely to cause serious harmthe failure to interview the parents does not infect the trial court's judgment.

b. There Is Substantial Evidence to Support the ICWA Detriment Finding.

We emphasize that neither parent objected to the admission into evidence of the Indian expert's declaration, or the expert's qualifications, so we do not address any specific challenge to the adequacy of the declaration, or the *1506 investigation conducted by the expert. (See In re Brian P. (2002) 99 Cal.App.4th 616, 623 [121 Cal.Rptr.2d 326] [regarding adequacy of adoption assessment].) Of course, while a parent may waive an objection to specific evidence, a claim that there is insufficient evidence to support the judgment is not waived by a failure to object. (Ibid.)[6]
Thus, the question for us to decide is whether there was substantial evidence to support the trial court's finding, beyond a reasonable doubt, that continued custody by the parents is likely to result in serious physical or emotional damage to the child, that is, the ICWA detriment finding. We review the court's ICWA detriment finding for substantial evidence. (In re Barbara R., supra, 137 Cal.App.4th at p. 951.) Under this standard, we do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence to the contrary. (In re Casey D. (1999) 70 Cal.App.4th 38, 52-53 [82 Cal.Rptr.2d 426].) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding. (In re L. Y. L. (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688].)
The expert's opinion was but one factor considered by the trial court in deciding, beyond a reasonable doubt, that continued custody by the parents would result in serious physical or emotional damage to the child. The court considered numerous reports and addenda prepared by the DPSS social worker, including the adoption assessment and the Indian expert's opinion. The Tribe, and the Tribe's social worker, were in agreement with the social worker's recommendation to terminate parental rights. On multiple occasions when the postpermanency hearing (§ 366.3) was continued, all partiesincluding the parentsstipulated that the permanent plan of adoption was appropriate.
The reports submitted at the section 366.26 hearing included information about father's failure to avail himself of reunification services prior to the adjudication of dependency. He failed to submit to drug testing despite his history of substance abuse, and a report from the Riverside County Department of Mental Health dated November 8, 2007, indicated that father was currently abusing controlled substances, rendering him unable to benefit from *1507 psychotherapy.[7] He continued to deny molesting his stepdaughter, although he acknowledged his 1992 convictions for molesting other children. He also denied a history of substance abuse despite his conviction for transporting methamphetamine. He also insisted that his status as a sex offender did not prohibit him from having contact with children. He did not initiate any reunification services on his own after the court denied services at the disposition hearing.
Mother initiated some services, but she was terminated from counseling because she denied using drugs or alcohol,[8] smelled of alcohol when she appeared for therapy, and was terminated from parenting classes due to excessive absences. More importantly, she maintained her relationship with father, a registered sex offender, allowing him to have contact with her children despite the fact his parole conditions prohibited contact with the children, which gave rise to the sexual abuse allegations as to her oldest daughter, and then blamed her child for the molestation allegation. Even after the molestation allegations resulted in the removal of her older children, mother maintained her relationship with father, placing M.B. at risk.
In these significant respects, this case is distinguishable from the Alaska decisions on which father relies, where the judgments terminating parental rights were reversed. Especially in the case of J.J. v. Alaska, supra, 38 P.3d 7, where the social worker's reports were incomplete (omitting information about the mother's rehabilitation efforts), the lack of an independent investigation rendered the Indian expert's opinion meaningless. After all, the opinion of an expert is no better than the reasons upon which it is based. (People v. Gardeley (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].) However, here, the DPSS social worker's reports were not incomplete or inaccurate and the Indian expert reviewed them, in addition to visiting the child in his placement, interviewing the child's caregiver, as well as the Indian social worker and the DPSS social worker. The facts of this case are more similar to the situations presented in J.A. v. Alaska, supra, 50 P.3d at page 400, and Marcia V. v. Alaska, supra, 201 P.3d at page 507, where the judgments terminating parental rights were affirmed.
The evidence adduced at the section 366.26 hearing, even without the opinion of the Indian expert, supported the court's finding, beyond a reasonable doubt, that continued custody by the parents was likely to result in serious physical or emotional damage to the child.

*1508 DISPOSITION
The judgment is affirmed.
Hollenhorst, J., and McKinster, J., concurred.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless stated otherwise.
[2] The oldest child involved in the prior dependency has a different father.
[3] The jurisdiction hearing was continued until ICWA noticing was complete, and an ICWA Indian expert was identified.
[4] Although the court stated it did not know the exact specifications that qualify one to be an Indian expert, or if there is a requirement that an Indian expert talk with the parents, it concluded there was some independent investigation. No objection was made by the parents to a ruling by the court and no request was made to provide evidence of the specific requirements of an Indian expert. Thus, this secondary issue was not preserved for appeal.
[5] Father bases his assertion on the commentary to section D.4 in the Guidelines. However, section D.4 simply relates to the requirement of competent testimony from an Indian expert. Subsection (a) to section D.4 states that removal of an Indian child must be based on competent testimony from one or more "experts qualified to speak specifically to the issue of whether continued custody by the parents or Indian custodians is likely to result in serious physical or emotional damage to the child." (Guidelines, 44 Fed.Reg. 67584, 67593, § D.4.(a) (Nov. 26, 1979).) Nothing in the commentary or the specific guideline states that an Indian expert is required to conduct an independent investigation to evaluate the case and reach a conclusion that is qualitatively more reliable than the DPSS social worker or the Tribe's social worker.
[6] Had father's counsel objected to the admission of the expert's testimony or declaration for lack of foundation due to inadequate investigation, we would review for abuse of discretion. (People v. Williams (1997) 16 Cal.4th 153, 196 [66 Cal.Rptr.2d 123, 940 P.2d 710].)
[7] This information was summarized in the declaration prepared by the Indian expert whose opinion was offered at the jurisdiction/disposition stage. The actual report was not included in the record on appeal, but father did not challenge this information in the trial court.
[8] This denial is remarkable since two of her older children were born with fetal alcohol syndrome.