Filed 3/14/23  In re G.S. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re G.S., A Person Coming Under the Juvenile Court Law. | B322367 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>B.S.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP02740A) |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore.  Conditionally affirmed and remanded.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen D. Watson, Senior Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court assumed dependency jurisdiction over G.S. (Minor) after sustaining allegations that her parents, B.S. (Mother) and M.L. (Father), engaged in domestic violence and substance abuse.  Termination of the parents' reunification services and, ultimately, parental rights ensued.  Mother appeals from the parental rights termination order and we consider (1) whether the juvenile court erred in denying her change of circumstances petition without holding an evidentiary hearing, (2) whether the juvenile court erred in finding inapplicable the parental benefit exception to law otherwise requiring termination of parental rights, and (3) whether reversal is required because no sufficient inquiry was made into whether G.S. is an Indian child under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.[1]

## I.  BACKGROUND

### A.    *The Department's Initial Investigation*

In April 2020, the Department received a referral alleging recurring domestic violence between Mother and Father. Department social workers investigated by interviewing Mother, Father, and several other family members: maternal grandmother C.S. (Maternal Grandmother); maternal uncle A.S. (Maternal Uncle); paternal grandmother M.C. (Paternal Grandmother); and paternal step-grandfather M.S.

The Department learned Mother was seventeen years old when she gave birth to Minor, who was approximately 21 months old at the time dependency proceedings commenced.  According to

_____

[1]    Father, whose parental rights were also terminated by the juvenile court, is not a party to this appeal.

2

those interviewed, Mother and Father would frequently yell at each other, sometimes in Minor's presence. Not long before the Department began investigating, the parents fought in Minor's presence and Father broke Mother's cell phone. During an earlier fight in Minor's presence, Father broke Mother's bedroom window. In 2019, Mother hit Maternal Grandmother while she was holding Minor. Maternal Grandmother and Maternal Uncle told Department social workers that Mother and Father sometimes neglect to feed Minor, which forces other family members to ensure she is fed.

Mother admitted she and Father had verbal arguments, but she denied there had been any physical violence between her and Father or Maternal Grandmother. Father similarly admitted to arguing with Mother, but he stated they do not really argue in front of Minor. Father admitted he slammed Mother's phone on the floor during an argument. He also admitted to breaking Mother's window, but both he and Mother asserted it was an accident. Mother and Father each denied failing to feed Minor. Father admitted to smoking marijuana and drinking alcohol, but he asserted he had never been drunk or high around Minor.

During her first interview with the Department, Mother agreed to complete a 52-week domestic violence program, individual and family counseling, and a parenting program. Mother made arrangements to begin therapy in May 2020. Minor was removed from Father's custody that same month and released to Mother's care.

*B.	The Dependency Petition and Early Hearings*

The Department filed a five-count dependency petition alleging Minor was at risk based on Mother and Father's domestic violence, Mother's violence against Maternal Grandmother, and Father's marijuana abuse.  Shortly thereafter, Mother and Father both completed ICWA-020 Parental Notification of Indian Status forms and informed a Department investigator they did not have any Indian ancestry.

After the juvenile court held an initial detention hearing, the Department filed an ex parte application seeking to have Minor removed from Mother's care.  The petition alleged Mother was in contact with Father, was allowing him to have unmonitored visits with Minor in Maternal Grandmother's home (in contravention of the orders made by the juvenile court at the detention hearing), was otherwise spending time with Father, and had terminated her counseling sessions.  The juvenile court held a hearing, detained Minor from Mother, and released her to Maternal Grandmother.  The court ordered monitored visitation for Mother of at least two times per week for two hours.

As of June 2020, Mother was enrolled in a parenting class and had restarted individual counseling.  Maternal Grandmother reported Mother was visiting Minor twice a week for two hours.  Father had not contacted Maternal Grandmother about any visits.  Mother also later enrolled in a domestic violence course.

At a jurisdiction and disposition hearing in August 2020, the juvenile court sustained an amended count a-1 alleging Minor was at substantial risk of suffering serious physical harm inflicted non-accidentally by a parent, a count b-2 alleging Minor was at substantial risk of suffering serious physical harm from Mother's physical altercation with Maternal Grandmother, and a

4

count b-3 alleging Minor was at substantial risk of suffering serious physical harm from Father's marijuana abuse. The court ordered Mother to participate in a domestic violence support group for victims, conjoint counseling with Father, parenting courses, and individual counseling to address anger management. Father was also ordered to participate in services, and Mother and Father were each granted monitored visitation with Minor.

### C. Termination of Reunification Services

In the first review period following the court's assumption of jurisdiction over Minor, Mother fell out of contact with the Department for several months. By January 2021, Mother had attended visits with Minor monitored by Maternal Grandmother, but her attendance had become increasingly sporadic. Mother had also participated in a parenting program, but she had not received a completion certificate because her participation was minimal. She had enrolled in a domestic violence course and attended 14 victim support group sessions. She had not participated in conjoint counseling with Father because she did not want contact with him. Additionally, though Mother and Maternal Grandmother were referred to conjoint counseling, Mother did not appear for the first session. Mother also did not act on the Department's suggestion that she re-enroll in parenting and domestic violence classes.

At the 6-month review hearing, the juvenile court continued reunification services for Mother and set the matter for a 12-month review hearing.

5

In July 2021, the counselor conducting conjoint counseling reported Mother had only attended two or three sessions.[2] According to the counselor, Mother's lack of participation was getting in the way of bonding with Minor and learning skills to address Minor's needs. The counselor also reported Minor routinely experienced an increase in anxiety during and after visits with Mother, which resulted in increased tantrums, biting, screaming, and crying. Mother's apparent lack of respect for Maternal Grandmother also had a negative effect on Minor and heightened her anxiety.

As of September 2021, Mother's visitation with Minor was inconsistent. Mother attended some visits, but she sometimes missed visits without advance notice, showed up late, or left early. She was often on her phone during visits and would sometimes go the majority of a visit without engaging with Minor. A Department social worker observed Minor refer to Mother by her given name during a visit, and observed that Minor sought out Maternal Grandmother when she needed assistance or wanted attention.

Mother had also made minimal progress with her case plan. She reenrolled in a domestic violence support group in July 2021 but she delayed attending. Mother joined the waiting list for another parenting class, but she had not completed the intake process or attended classes. She was enrolled in individual

---

[2]     The sessions were held at Maternal Grandmother's home, and were scheduled such that Mother could have the session at the beginning of her visit with Minor, and then continue to visit with Minor afterward.

counseling, but she had not enrolled in conjoint counseling with Father, whose whereabouts were unknown.

At a review hearing in October 2021, the juvenile court found the parents' progress toward alleviating the conditions that necessitated placement was not substantial.  It terminated reunification services and ordered the Department to provide permanent placement services to Minor.

> D.      *Developments Following the Termination of Reunification Services and Termination of Parental Rights*

Following termination of reunification services, Maternal Grandmother petitioned to adopt Minor.  Mother was visiting Minor approximately once per week.  A Department social worker observed a visit between Mother and Minor in November 2021 during which Minor hugged Mother, and the two sat at a table and read books together.  Mother appeared attentive to Minor and interacted with her appropriately.  Maternal Grandmother reported that during other visits Mother would sometimes become impatient with Minor and yell when she did not listen.

In July 2022, Mother filed a change of circumstances petition requesting reinstatement of reunification services.  Mother represented she had completed a domestic violence class, she had been visiting with Minor four to five times per week and the visits were going well, and she was pursing counseling.  Mother sought an additional six months of reunification services to complete more of the case plan and continue to build a bond with Minor.  The court denied the petition without a hearing.

That same day, the court held a Welfare and Institutions Code section 366.26 permanency planning hearing.  At the

7

hearing, the juvenile court inquired as to the status of ICWA inquiry efforts in light of the record that reflected only a statement and inquiry in 2020, with no further update. The Department represented it did not have any new information, explaining the case had always been treated as a non-ICWA case. The court then inquired directly of Mother, asking whether she had any other information regarding any Native American heritage, or whether she had any family members who received benefits or lived on a reservation. Mother responded, "No, not really." The court asked Mother to clarify what she meant, ultimately asking whether anyone ever told her they belonged to a tribe or lived on a reservation. Mother responded "No, no. No one." The court then asked whether Mother had any information about her father's ancestry, and Mother responded he had been deported to "T.J." The court thereafter found this appeared to not be an ICWA case, and ICWA did not apply.

The court then addressed adoption readiness, stating Maternal Grandmother had been caring for Minor for approximately two years at that point. The court found there was no evidence of sufficient contact between Father and Minor such that the court could find it would be detrimental to Minor to terminate Father's parental rights. With respect to Mother, the juvenile court acknowledged that Mother had been visiting with Minor and contact between Minor and Mother did provide some sort of a bond and relationship. The court acknowledged that Minor resided with Mother for the first half of her life, but emphasized Mother had not been living with Minor more recently. The court recognized that under recent Supreme Court authority, "there is to be a delicate balancing" that requires the

8

court to look closely at Mother's contact with Minor within the confines of the visitation order.

The juvenile court believed Mother's more consistent visitation of late was "a new development" and stated on the record that there was "no evidence before me that [Minor] won't continue to have contact with her mother if the court were to terminate parental rights today, because the maternal grandmother is the prospective adoptive parent." Even assuming Mother was visiting consistently and there was a strong positive emotional attachment between Minor and Mother, however, the court still found terminating parental rights would not be detrimental when balanced against the benefits of an adoptive home. In so finding, the court again stated that "because the maternal grandmother is the prospective adoptive parent, I don't see how that incidental relationship or that continuing conduct won't occur. The same way that I'm not seeing examples of the depth of that bond and the emotional attachment, I'm also not hearing that the maternal grandmother won't allow contact and won't engage with the Mother to allow the Mother to see [Minor]."

Having found the parental benefit exception inapplicable, the juvenile court found Minor adoptable and ordered Mother's parental rights terminated.

## II.  DISCUSSION

We shall affirm the juvenile court's orders. The court was not required to hold an evidentiary hearing on Mother's change of circumstances petition under Welfare and Institutions Code section 388 because there is no evidence that restarting

9

reunification services would be in Minor's best interests.[3] As to the parental benefit exception, Mother is correct that the juvenile court should not have considered potential future visitation between Mother and Minor, but such consideration was harmless because the dearth of evidence that Minor would benefit from continuing the relationship with Mother means parental rights would have been terminated even without such consideration. Finally, no reversal on ICWA grounds is warranted because substantial evidence supports the juvenile court's finding that adequate inquiry was made to determine Minor is not an Indian child and, in any event, Minor's placement with her grandmother means any assumed inquiry deficiency was harmless.

### A.    The Juvenile Court Did Not Err in Summarily Denying Mother's Section 388 Change of Circumstances Petition

"Section 388 accords a parent the right to petition the juvenile court for modification of any of its orders based upon changed circumstances or new evidence.  [Citations.]  To obtain the requested modification, the parent must demonstrate both a change of circumstances or new evidence, and that the proposed change is in the best interests of the child.  [Citations.] [¶] . . . [¶]  To obtain an evidentiary hearing on a section 388 petition, a parent must make a prima facie showing that circumstances have changed since the prior court order, and that the proposed change will be in the best interests of the child. [Citations.]  To make a prima facie showing . . . the allegations of

_____

[3]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

10

the petition must be specific regarding the evidence to be presented and must not be conclusory.  [Citation.]" (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478, fn. omitted (*Alayah J.*).)

"In determining whether a parent has made a prima facie showing under section 388, we may consider the entire factual and procedural history of the case." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.)  We review the grant or denial of a section 388 petition for an abuse of discretion. (*Alayah J.*, *supra*, 9 Cal.App.5th at 478; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

Mother's section 388 petition alleged she had completed a domestic violence class, had been visiting with Minor four to five times per week with no issues, and was pursuing counseling. Mother's petition was silent as to another incomplete portion of her prior case plan—namely the requirement that she complete a parenting course.

Assuming for the sake of argument that this evidence was sufficient to demonstrate changed circumstances, Mother's petition was still insufficient to warrant a hearing because Mother provided no evidence that restarting reunification services would be in Minor's best interests.  Incremental compliance with her prior case plan and assertions that renewed services would provide her more time to build a bond with Minor did not constitute evidence that a revival of reunification services would have been in Minor's best interests. (See, e.g., *In re Angel B.* (2002) 97 Cal.App.4th 454, 463 ["simple completion" of a course is not evidence that a changed order would be in the child's best interests].)  Particularly when Minor had been in Maternal Grandmother's sole care for approximately two years and was happy and bonded to Maternal Grandmother, the

11

juvenile court did not abuse its discretion in summarily denying mother's section 388 petition.

> **B.** *The Juvenile Court Should Not Have Remarked on Future Visitation, but the Error Was Harmless*

A juvenile court holds a hearing under Welfare and Institutions Code section 366.26 to determine "whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan." (*In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).) "To ease the court's difficult task in making this important decision, the statute provides a carefully calibrated process. Even if a court finds by clear and convincing evidence that the child is likely to be adopted, the parent may avoid termination of parental rights by establishing at least one of a series of enumerated exceptions." (*Ibid.*)

One of these exceptions is the parental benefit exception. (§ 366.26, subdivision (c)(1)(B)(i).) The exception is "limited in scope" and applies where "'[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) From th[is] statute, [our Supreme Court] readily discern[ed] three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*,

*supra*, 11 Cal.5th at 631, third, fourth, and fifth alterations added.)

The second element—whether the child would benefit from continuing the relationship—depends on "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, 11 Cal.5th at 632, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) As emphasized in *Autumn H.*, cited in *Caden C.* as "the seminal decision interpreting the exception" (*Caden C.*, *supra*, at 631), the parental benefit exception is not concerned with the "incidental benefit" that "[i]nteraction between natural parent and child will always confer." (*Autumn H.*, *supra*, at 575-576 [holding that a relationship comparable to that of a "'friendly visitor'" or "'family friend'" is insufficient to trigger the exception].) Nonetheless, juvenile courts "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.]" (*Caden C.*, *supra*, at 632, second alteration added.)

We review the juvenile court's determination of the existence of a beneficial relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at 639.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Id.* at 640.)

The Department argues Mother forfeited the ability to complain about the juvenile court's consideration of the likelihood of post-adoption contact between her and Minor because she did not object to that consideration below. The Department may well

13

be right about that, but we would exercise our discretion to explain why Mother is not entitled to reversal regardless.

The juvenile court here expressly considered the likelihood that Mother would continue to have contact with Minor when making its ruling on the parental benefit exception. That should not have happened. "Considering a potential future relationship between the parents and the minors, for any reason, is impermissible at a section 366.26 hearing." (*In re D.P.* (2022) 76 Cal.App.5th 153, 169; see also *Caden C.*, *supra*, 11 Cal.5th at 633 ["courts must assume that terminating parental rights terminates the relationship"].)

The error, however, was harmless. (See generally *In re Celine R.* (2003) 31 Cal.4th 45, 59-60; *In re J.R.* (2022) 82 Cal.App.5th 526, 533 [where "the proper legal standard is already established and a party has had a full and fair opportunity to present all of their evidence on a contested issue, and yet in the end there is simply no evidence that could support a favorable finding for them, then any legal error in the court's reasoning or basis for its decision quite obviously is harmless"].) It was Mother's burden to prove the elements of the parental-benefit exception, including that Minor would benefit from a continuing relationship with her. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at 635). Mother could have done so by adducing evidence Minor had a substantial, positive, and emotional attachment to her (see, e.g., *In re D.M.* (2021) 71 Cal.App.5th 261, 271 [father testified his children wanted to return to him and that the youngest child cried when visits ended]; *In re J.D.* (2021) 70 Cal.App.5th 833, 856 [mother introduced logs of virtual visits with her son detailing their bond]) or pointing to evidence otherwise in the record (e.g., *In re*

14

*B.D.* (2021) 66 Cal.App.5th 1218, 1229, fn. 4 [evidence that children greeted parents with hugs and expressed sadness at end of visits suggested they had a "beneficial relationship"].) Mother did neither, and our own review of the record confirms that there is no substantial evidence of the requisite beneficial relationship.

Rather, the evidence in the record suggests that while the visits between Mother and Minor were generally positive, Mother barely engaged with Minor during some visits, Minor at least sometimes referred to Mother by her given name, and Minor often sought out Maternal Grandmother, not Mother, for assistance or attention during visits. There is no indication in the record that the visits conferred upon Minor anything more than the "incidental benefit" that "[i]nteraction between natural parent and child will always confer." (*Autumn H.*, *supra*, 27 Cal.App.4th at 575.) Because there was no evidence that could support a favorable finding for Mother, the juvenile court's error was harmless, and reversal is unwarranted.[4]

> C. *Substantial Evidence Supports the Juvenile Court's ICWA Findings and, Regardless, Any Assumed Error Was Harmless*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian

---

[4] In light of our holding on this score, we need not address Mother's contention that the juvenile court also utilized improper factors to analyze whether termination of parental rights would be detrimental to Minor.

child from his or her family. (25 U.S.C. § 1902; *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8; *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 784.) Under ICWA, the Department and the juvenile court have "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child." (§ 224.2, subd. (a); see also Cal. Rules of Court, rule 5.481(a).) We review the juvenile court's ICWA findings for substantial evidence. (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467; *In re Barbara R.* (2006) 137 Cal.App.4th 941, 950.)

Here, both Mother and Father signed ICWA-020 forms indicating they had no Indian ancestry and made similar assertions to Department employees. The juvenile court also questioned Mother at the termination hearing, inquiring as to whether any family members had ever said anything like "I belong to a tribe" or "I live on a reservation." Mother responded no one had, and there is no contrary evidence in the record. The juvenile court's ICWA finding was thus supported by substantial evidence. (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1014.)

Furthermore, in readily conceding error, the Department neglects to discuss the significance of Minor's placement with Maternal Grandmother (and her status as the prospective adoptive parent). As another court has held, and as holds true here, placement of a minor with a family member who necessarily shares any assumed maternal Indian ancestry that Minor has[5] means any posited deficiency in conducting ICWA-related inquiry would be harmless. (*In re J.W.* (2022) 81 Cal.App.5th 384, 390 ["Assuming for the sake of argument that an inquiry would have

---

[5] When asked on the record, Mother said Father's parents were Mexican.

discovered that J.W.'s maternal family held Indian roots, the purpose of ICWA—to prevent the removal of Indian children from their Indian families—is not implicated by the juvenile court's final disposition.  When J.W. was found adoptable, her prospective adoptive parent was her maternal grandmother, who had already adopted J.W.'s half-brother.  J.W. was not facing alienation or separation from any assumed Indian ancestry"].)


BAKER, Acting P. J.

17

In re G.S.
B322367


Separate Opinion of Kim, J.


I join all but Section II.C. of Justice Baker's opinion. As to the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) issue raised and discussed in that section, I conclude the Los Angeles County Department of Children and Family Services (Department) did not comply with the requirements of ICWA and related California law because the Department did not interview maternal grandmother and maternal uncle about Indian ancestry. (*In re H.V.* (2022) 75 Cal.App.5th 433, 438.) Further, the Department's placement of the child with the maternal grandmother does not render the failure to comply harmless. (*In re J.W.* (2022) 81 Cal.App.5th 384, 392–393 (dis. opn. of Wiley, J.).)

The disposition of the appeal is accordingly this: the juvenile court's orders are conditionally affirmed and the cause is remanded for additional ICWA-related inquiry of available maternal relatives, including maternal grandmother and maternal uncle.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

I concur:

MOOR, J.

2